2021 IL App (1st) 181726-U

FOURTH DIVISION
June 30, 2021

No. 1-18-1726

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| | ) | No. 14 CR 11753 (02) |
| KENDALL ROBERSON, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Allen F. Murphy, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justice Lampkin concurred in the judgment.
Presiding Justice Gordon dissented.

**ORDER**

¶ 1    *Held*:    Affirming the sentence of the trial court where defendant's 40-year sentence did not violate the eighth amendment of the U.S. Constitution or the proportionate penalties clause of the Illinois Constitution, and the trial court's sentence was not otherwise excessive or otherwise imposed in error.

¶ 2    After a jury trial, defendant Kendall Roberson was found guilty of first degree murder

and attempted murder under an accountability theory and sentenced to a cumulative term of 40

years' imprisonment. Defendant was 17 years old at the time of the offense. On appeal, defendant maintains that he is entitled to a new sentencing hearing because the trial court failed to consider the required statutory mitigating factors set forth in section 5-4.5-105(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105(a) (West 2018)). He further argues that his *de facto* life sentence violates the United States and Illinois Constitutions where he is not one of the rare youths warranting such a term and that his sentence is otherwise excessive. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4      As defendant does not challenge the sufficiency of the evidence and raises issues solely related to his sentencing, we set forth only those facts necessary for the consideration of this appeal.

¶ 5      Defendant was charged by indictment, along with Essie Nooner (Nooner) and William Gillyard (Gillyard), with the murder of John McIntyre (McIntyre) and the attempted murder of Najee Kellum (Kellum) under an accountability theory. The State's evidence at trial established that on June 6, 2014, the 17-year-old defendant called McIntyre and asked if he wanted to purchase two televisions. After McIntyre agreed, defendant instructed him to meet him at defendant's home. McIntyre then drove with Kellum to defendant's residence. While they waited for McIntyre to arrive, Gillyard declared to defendant, Nooner, Tamara Ivy (Nooner's girlfriend), Iesha Steward (defendant's girlfriend), and Durrell Roberson (defendant's brother), that he was going to shoot McIntyre in the back of the head so he could take money and drugs from McIntyre. Gillyard also stated that if anyone else was with McIntyre, they would be shot as well.

¶ 6      When McIntyre arrived, defendant, Nooner, and Gillyard got into the back seat of

McIntyre's vehicle. As McIntyre was pulling into the driveway of the abandoned house where the televisions were being kept, Gillyard shot McIntyre in the head and shot Kellum twice, striking her once in the side of her face and once in her wrist. Kellum ran from the vehicle and defendant, Nooner, and Gillyard dispersed. McIntyre was pronounced dead at the hospital a short time later.

¶ 7    Kellum identified defendant as one of the offenders in a photo array. After waiving his *Miranda* rights, defendant was interviewed by detectives with his mother present. His videotaped interview was admitted into evidence and published to the jury. During his interview, defendant admitted that he, Gillyard, and Nooner had been planning to rob McIntyre since "the beginning of summer" and that the plan to murder McIntyre was solidified the day of the robbery. Defendant admitted he called McIntyre to set up the robbery and that he knew Gillyard intended to murder McIntyre. Defendant, however, denied he intended to murder McIntyre. According to defendant, he only wanted to rob McIntyre because he was "money hungry."

¶ 8    The State rested its case and defendant presented no evidence. After hearing closing arguments and jury instructions, the jury found defendant guilty of first degree murder and attempted murder.

¶ 9    The matter then proceeded to sentencing and the trial court ordered a presentence investigation report (PSI). The PSI indicated that defendant was raised by both his parents with whom he had a good relationship. He is one of four children and attended New Covenant Baptist Church with his family. Defendant described his parents as loving, caring, and supportive. He denied any abuse or neglect and any Department of Children and Family Services involvement. Defendant further stated that his paternal grandparents played an active role in his upbringing.

Regarding his schooling, defendant completed ninth grade and was currently enrolled in high school while in custody. Defendant planned to complete his high school education. Defendant did admit, however, that he was suspended seven or eight times from high school prior to his incarceration for tardiness, absenteeism, and once for stealing someone's cellular telephone. Defendant was never employed and relied solely on his parents for support. He was never involved in a street gang. He also was in good physical and mental health and has no learning disabilities. Defendant did admit to smoking cannabis daily since the age of 14.

¶ 10     At the sentencing hearing, the State presented the following evidence in aggravation. The State introduced the victim impact statement of John McIntyre, Sr., the victim's father, who stated the impact of his child's death weighed heavily on him, especially since his son's murder was "planned and premeditated" by his own friends. Mr. McIntyre stated, "These were not strangers to my son, these were guys that he thought were his friends. John lived in the house that [defendant]'s family actually lives in now. These were guys that ate over at John's house, they played ball together, hung out together." The victim's mother, Tonya Walker, echoed Mr. McIntyre's statement and stressed that the perpetrators of this offense, including defendant, grew up on the same street as her son and had known him for their whole lives. The State then argued in aggravation that while this case was pending defendant was charged with three other offenses including possession of a weapon in a penal institution and public indecency. The State maintained that defendant's behavior is not that of "somebody who is really contemplative of their actions" and requested a "just sentence."

¶ 11     In mitigation, defense counsel discussed the factors applicable to offenders under the age of 18 as found in section 5-4.5-105 of the Code. Specifically, defense counsel argued that the trial court should not apply any firearm enhancement to defendant's sentence. Defense counsel

observed that at the time of the offense, defendant was three months past his seventeenth birthday. He further argued defendant acted impetuously where the murder was planned only "hours before" and that Gillyard and Nooner, who were older than defendant, had influenced him. Defense counsel also observed that defendant had significant rehabilitative potential and noted that defendant's family was present at every court date. Defendant also attended church regularly and had a letter in support from a reverend of his church. Lastly, defense counsel emphasized defendant's "minimal involvement" in the offense where defendant was not armed with a firearm, did not harm anyone, and "never took anything." Defendant also had no prior criminal history. Defense counsel, citing *Miller v. Alabama*, 567 U.S. 460 (2012), requested the minimum sentence of 26 years.

¶ 12    After considering the law involving juvenile sentences in Illinois and all the factors in aggravation and mitigation, the trial court found that the minimum sentence with firearm enhancements (56 years) was excessive considering the level of defendant's culpability in the commission of the offense and therefore declined to impose the firearm enhancements. The court then sentenced defendant to 30 years to be served at 100 percent time for first degree murder and 10 years for attempted murder to be served at 85 percent time for a total sentence of 40 years' imprisonment and 38.5 years in custody. Defendant was also sentenced to a term of three years' mandatory supervised release.

¶ 13    In sentencing defendant, the trial court stated that "[t]he violence in this case is the most unspeakable violence I have ever beared [*sic*] witness to. It is truly shocking what occurred here." The trial court noted that the armed robbery was premeditated, with Gillyard boasting in public that he was going to shoot McIntyre in the back of the head. The court also noted that there were varying levels of culpability in the offense with Gillyard "being the worst" and the

least culpable being defendant. The trial court further observed that defendant came from a decent family, was young at the time of the offense, and was enrolled at high school with no prior criminal history.

¶ 14    This appeal follows.

¶ 15                                  ANALYSIS

¶ 16    On appeal, defendant argues we should remand this matter for resentencing because his 40-year sentence, which was imposed for an offense he committed when he was 17 years old, violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of our state constitution (Ill. Const. 1970, art. I, § 11) as applied to him. He further asserts that he is entitled to a new sentencing hearing as the trial court failed to consider the required statutory mitigating factors of section 5-4.5-105(a) of the Code applicable to juvenile offenders. For the reasons which follow, we affirm.

¶ 17                             Eighth Amendment

¶ 18    The eighth amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions. *Miller*, 567 U.S. at 469. When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. In *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller*, the United States Supreme Court addressed that risk and unmistakably instructed that youth matters in sentencing. *People v. Holman*, 2017 IL 120655, ¶ 33. *Roper* held that the eighth amendment prohibited capital sentences for juveniles who commit murder. *Roper*, 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. *Graham*, 560 U.S. at 82. And *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder.

*Miller*, 567 U.S. at 489-90. Our supreme court has read the eighth amendment protections afforded to juvenile sentencing as extending to discretionary life sentences. *Holman*, 2017 IL 120655, ¶ 40.

¶ 19    In *Buffer*, our supreme court found that, to prevail on a claim that a juvenile's sentence violated the eighth amendment, a defendant must demonstrate both (1) that he was "subject to a life sentence mandatory or discretionary, natural or *de facto*," and (2) that "the sentencing court failed to consider youth and its attendant characteristics." *People v. Buffer*, 2019 IL 122327, ¶ 27. As a result, a sentencing court's failure to consider youth and its attendant characteristics, by itself, is not enough. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 125. Thus, a defendant must first establish he was subject to a life sentence before we are to consider whether the sentencing court failed to consider his youth and its attendant circumstances. *Id.* (citing *Buffer*, 2019 IL 122327, ¶ 27). In this instance, defendant was not subject to either a mandatory life sentence or a natural life sentence; therefore, he can satisfy this requirement only if he can demonstrate he was subject to a discretionary *de facto* life sentence.

¶ 20    We are cognizant of the fact while this appeal was pending the U.S. Supreme Court issued its decision in *Jones v. Mississippi*, 593 U.S. ——, 141 S. Ct. 1307 (2021). Therein, it considered a discretionary sentence of life without parole imposed upon a 15-year-old juvenile offender where the sentencer nevertheless had discretion to "consider the mitigating qualities of youth" and impose a lesser punishment. *Id.* at 1311. The Supreme Court concluded that, in such circumstances, the eighth amendment does not *require* a court imposing a sentence of life without parole to make "a separate factual finding that the defendant is permanently incorrigible, or at least provide an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible." *Id.* at 1318. Importantly, however, the Supreme Court

explicitly stated that the decision in that case "does not overrule *Miller* or *Montgomery*." *Id.* at 1321. The Supreme Court also noted that states are free to impose "additional sentencing limits in cases involving defendants under 18" or "require sentencers to make [specific] factual findings before sentencing an offender under 18 to life without parole." *Id.* at 1323. In fact, the Court held that states are not limited in the procedures they choose to apply in determining when, as well as whether, a juvenile offender can ever be sentenced to life. *Id.*

¶ 21    Whether *Jones* has an impact on Illinois state law need not be addressed in this case as *Jones* involved a 15-year-old sentenced under Mississippi law to a discretionary life sentence without parole and, thus, no issue existed regarding whether or not the eighth amendment applied. In the present case, however, whether defendant's sentence violated the eighth amendment is dependent upon the length of sentence he received. Thus, whether defendant received a *de facto* life sentence is a threshold issue, which we now turn to address.

¶ 22                    *De Facto* Life Sentence

¶ 23    Defendant argues his 40-year sentence is a *de facto* life sentence under *Buffer*. While defendant acknowledges that the *Buffer* court wrote, "a prison sentence of 40 years or less *** does not constitute a *de facto* life sentence" (*Buffer*, 2019 IL 122327, ¶ 41), he asserts, however, that other language in *Buffer*, including Justice Burke's dissent, suggests that a 40-year sentence is a *de facto* life sentence.

¶ 24    We find our opinion in *Gunn* to be dispositive of this issue. In *Gunn*, the 17-year-old defendant was convicted of first degree murder and sentenced to 40 years' imprisonment. *Gunn*, 2020 IL App (1st) 170542, ¶ 1. On appeal, defendant maintained that his 40-year sentence was a *de facto* life sentence under *Buffer*. We disagreed, finding that our supreme court expressly found that " 'a prison sentence of 40 years or less imposed on a juvenile offender does *not*

constitute a *de facto* life sentence in violation of the eighth amendment.' " (Emphasis in original.) *Id.* ¶ 127 (quoting *Buffer*, 2019 IL 122327, ¶ 41). As the defendant's sentence was exactly 40 years, applying the words of *Buffer*, the defendant's sentence was not a *de facto* life sentence. *Id.* Similarly, defendant here was also sentenced to exactly 40 years and, consequently, his sentence was not a *de facto* life sentence. Furthermore, this conclusion has been echoed in subsequent cases. See *People v. Benford*, 2021 IL App (1st) 181237, ¶ 14 (rejecting the defendant's claim that his 40-year sentence was a de facto life sentence); *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 63 (rejecting the juvenile defendant's claim that his 40-year sentence amounted to a *de facto* life sentence under *Buffer* on the ground that "[t]here is no way to interpret '40 years or less' as '40 years or more' ").

¶ 25     Defendant further argues that his 3-year term of mandatory supervised release "requires him to serve a sentence over 40 years." Considering this exact issue, the *Gunn* court examined *Buffer* and observed that, in *Buffer*, the defendant was sentenced to 50 years followed by 3 years of mandatory supervised release, yet our supreme court only referred to defendant's "50-year sentence." *Gunn*, 2020 IL App (1st) 170542, ¶ 138. The *Gunn* court stated, "If the [supreme] court believed that the three years of mandatory supervised release should have been counted, it would have referred to his 53-year sentence." *Id.* In addition, the *Gunn* court also observed that *Buffer* "said nothing about including a mandatory supervised release term and did state unequivocally that 'a *prison* sentence of 40 years or less' is not life. (Emphasis added.)." *Id.* ¶ 139. Thus, we are not persuaded by defendant's argument that his 3-year mandatory supervised release term pushes his 40-year sentence over "the line" into a *de facto* life sentence. See *id.*; see also *Benford*, 2021 IL App (1st) 181237, ¶ 15.

¶ 26     We further observe that defendant was sentenced to 30 years for first degree murder and

10 years for attempted murder for a total of 40 years' imprisonment. As noted by the State and the trial court, defendant's 30-year term is to be served at 100% and his 10-year term is to be served at 85%. Accordingly, defendant will actually be imprisoned for 38.5 years. Nevertheless, regardless of whether we consider defendant's term to be 40 years or 38.5 years, the result is the same—defendant's sentence is not a *de facto* life sentence. Accordingly, defendant's eighth amendment claim fails. See *Buffer*, 2019 IL 122327, ¶ 27.

¶ 27                               Proportionate Penalties Clause

¶ 28    Defendant maintains, however, that even if his sentence does not violate the eighth amendment, it violates the broader Illinois proportionate penalties clause as applied to him. Defendant argues that his 40-year sentence shocks the moral sense of the community because it did not account for his rehabilitative potential. Defendant states that "research suggests that he would grow out of such a violent phase in five to 10 years—not 40." He further notes that his criminal history included no adjudications prior to the instant offense. He also contends that he has the support of his family and attended school. Defendant maintains that the trial court "never connected this information" to his rehabilitative potential.

¶ 29    The defendant raises an as-applied constitutional challenge, which requires a showing that his sentence violates the constitution as it applies to the facts and circumstances of his case. *People v. Thompson*, 2015 IL 118151, ¶ 36. In contrast, a facial challenge requires a showing that the sentence is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant. *Id.* An as-applied constitutional challenge is a legal question that we review *de novo*. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 97.

¶ 30    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful

citizenship." Ill. Const. 1970, art 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 31    We cannot find that a 40-year sentence for a 17-year-old who assisted in planning the robbery knowing that Gillyard intended to murder McIntyre shocks the moral conscience. First, we observe that defendant was sentenced to 30 years for the murder of McIntyre and 10 years for the attempted murder of Kellum. Regarding defendant's 30-year sentence, defendant admitted when interviewed by detectives (with his mother present) that he, Gillyard, and Nooner had been planning to rob McIntyre since the beginning of the summer of 2014. To facilitate this plan, defendant called McIntyre and asked him if he wanted to purchase two televisions. When McIntyre indicated he would, defendant directed McIntyre to come over to his home. On the day of the robbery, defendant, who had known McIntyre as a friend for many years, stood by as Gillyard stated that McIntyre would be shot in the head during the robbery. Instead of abandoning the plan and seeking assistance, defendant upon entering McIntyre's vehicle went through with the robbery. As the trial court noted, Gillyard was "true to his word" and shot McIntyre in the head. Defendant then ran away out of fear. A 30-year sentence for an offense such as this does not shock the moral conscience.

¶ 32    As to defendant's 10-year sentence for attempted murder, the State's evidence demonstrated that prior to executing the robbery, Gillyard told a group of individuals (including defendant) that if another person was in the vehicle accompanying McIntyre he would kill them as well. Accordingly, defendant knew of Gillyard's intent to kill both McIntyre and Kellum. The evidence further demonstrated that Gillyard shot McIntyre in the back of the head at close

range and fired his weapon again at Kellum in close range. She was struck in the face and wrist by the bullets, requiring surgery. As the facts of this crime demonstrate, it was not committed impetuously—it was calculated and deliberate—and defendant was able to appreciate the risks and consequences of committing such an offense. Furthermore, the deliberate nature of this offense is not indicative or reflective of someone who is acting in an immature manner. See *Buffer*, 2019 IL 122327, ¶ 19. While defendant had no prior criminal history, this robbery had been planned for at least two weeks and defendant did nothing to prevent it from occurring. Indeed, defendant's role in this offense was not a passive one and, in this way, defendant's cumulative 40-year sentence represents his personal culpability. Therefore, we find that defendant's 40-year sentence does not shock the moral conscience. See *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 70 (finding a 16-year-old's 40-year sentence for first degree murder did not shock the moral conscience so as to violate the proportionate penalties clause).

¶ 33    At this juncture, we find it necessary to address the dissent, which would reverse and remand defendant's sentence as it finds defendant's 40-year sentence shocks the moral sense of community. In so finding, the dissent compares the facts of defendant's case to those of *Gunn* wherein the *Gunn* defendant also received a 40-year sentence. *Gunn*, 2020 IL App (1st) 170542, ¶ 1. First, it is important to note that Gunn was found guilty of the first-degree murder of a single victim. *Id.* In this case, there were two victims—McIntyre was shot in the head execution style and Kellum was shot in the face and hand. The evidence clearly demonstrated that Gillyard aimed his weapon at Kellum's head and had previously made statements that he would kill any witnesses. Defendant was thus appropriately sentenced to 30 years for first-degree murder and 10 years for attempted first degree murder. Second, the dissent engages in cross-case comparative sentencing, a practice which has been rejected by our supreme court. See *People v.*

*Fern*, 189 Ill. 2d 48, 55 (1999) (finding that "such an analysis does not comport with our sentencing scheme's goal of individualized sentencing and would unduly interfere with the sentencing discretion vested in our trial courts"). To reiterate the words of our supreme court, "The propriety of the sentence imposed in a particular case cannot properly be judged by the sentence imposed in another, unrelated case." *Id.* at 56. Viewing the record before us, we cannot say that the trial court's sentence shocks the moral sense of the community.

¶ 34                          Statutory Sentencing Error

¶ 35    Defendant also asserts that the trial court committed plain error when it allegedly failed to apply section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2018)) at his sentencing hearing. Defendant acknowledges that defense counsel did not object to this error nor did he include it in his motion to reconsider sentence. He asks, however, that we review it under both prongs of the plain-error doctrine or, in the alternative, for ineffective assistance of counsel. To preserve a claim of sentencing error, a defendant must make a contemporaneous objection and file a written posttrial motion raising the issue. *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). Yet, under the plain error doctrine, "[p]lain errors or defects affecting substantial rights may be noticed [on appeal] although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). In the sentencing context, a defendant must demonstrate either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545 (citations omitted). "To obtain relief under this rule, a defendant must first establish that a clear or obvious error occurred." *Id.* This is because without reversible error, "there can be no plain error." *People v. Mitchem*, 2019 IL App (1st) 162257, ¶ 37.

¶ 36    At issue here is section 5-4.5-105(a) of the Code which provides that, "[o]n or after the

effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing," shall consider certain additional mitigating factors. 730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 37    Again, we find *Gunn* to be dispositive. In that case, the defendant argued that the trial court committed plain error when it failed to apply section 5-4.5-105(a) of the Code at the defendant's sentencing hearing. The *Gunn* court observed that our supreme court has found that "the trial court's obligation set forth in subsection (a)" to consider these additional factors is temporally limited by "language in that same subsection." *People v. Hunter*, 2017 IL 121306, ¶ 48. Applying *Hunter* and examining the plain language of section 5-4.5-105(a) of the Code, the *Gunn* court found it applied "only to offenses committed on or after the effective date, which was January 1, 2016." *Gunn*, 2020 IL App (1st) 170542, ¶ 153 (citing *Hunter*, 2017 IL 121306, ¶ 46). The offense in this case occurred on June 6, 2014. Since this offense was not committed on or after the effective date (January 1, 2016), this section did not apply at defendant's sentencing hearing. Accordingly, defendant's contention of error fails.

¶ 38    In addition, the *Gunn* court found that the fact a sentencing hearing occurred after the effective date of section 105(a) of the Code did not alter the temporal limitation imposed by the legislature:

>      "As we noted above, the temporal limit is phrased in terms of 'when a person commits an offense,' not when a person is sentenced. Not only is this the plain language of the act, it was also a reasonable choice by the legislature. *People v. Richardson*, 2015 IL 118255, ¶ 11, ("it was reasonable for the legislature to distinguish between offenses committed before and offenses committed after the amendment's effective date"). It was

reasonable for the legislature to choose to subject offenders who committed the same offenses on the same day to the same set of considerations, regardless of when their sentencing date happened to be. The legislature chose not to have every juvenile offender resentenced according to these considerations and rewarding those with a later sentencing date could have possibly rewarded offenders who had escaped justice longer."

*Id.* ¶ 154.

Accordingly, we are not persuaded by defendant's argument that section 105(a) applies to him as his sentencing occurred after the effective date of the statute.

¶ 39                                  Sentence Excessive

¶ 40     Lastly, defendant maintains that his sentence is excessive as it fails to reflect his rehabilitative potential and the substantial mitigating factors present in this case. Defendant notes his support from family and community demonstrate that he is "very likely to become an upstanding member of the community when he is released." He requests we reduce his sentence to the minimum 26 years or remand the matter for resentencing.

¶ 41     A sentence within the appropriate sentencing range is generally accorded great deference by this court. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 65. We accordingly will not alter a defendant's sentence absent an abuse of discretion. *Id.* "Our supreme court has found that, with respect to a sentence, an abuse of discretion occurs when the sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense." *Id.*

¶ 42     The sentencing range in this case was 20 to 60 years for first degree murder, so defendant's 30-year sentence fell within that range and is presumed to be proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In addition, the sentencing range for attempted murder is 6 to 30 years and therefore defendant's 10-year sentence is also within such range. See 730

ILCS 5/5-4.5-25 (West 2018).

¶ 43    We do not find that defendant's sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense.  First, defendant was sentenced at the mid-range for murder.  The evidence demonstrated that defendant was friends with McIntyre at the time of the offense and used his friendship with McIntyre to lure McIntyre to defendant's home.  As previously noted, this plan was deliberate and had been contemplated by defendant, Gillyard, and Nooner for at least two weeks before they acted on it.  What defendant appears to forget is that there were two victims in this case, McIntyre (who was murdered) and Kellum (who was shot in the face).  Defendant was sentenced to the lower range for attempted murder despite the evidence establishing that defendant was aware that Gillyard intended to kill any individual who was with McIntyre during the robbery.  Moreover, while defendant admitted that the motive for robbing McIntyre was money, there was no motive for shooting Kellum other than just inflicting harm on another person.

¶ 44    The record and the trial court's ultimate sentence demonstrates that the trial court took into consideration the mitigating factors, particularly defendant's potential for rehabilitation. This was established through defendant's lack of prior criminal history, his strong family upbringing, and his pursuit of education.  The presence of mitigating factors, however, does not necessarily require a minimum sentence. See *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 25.  Furthermore, while the trial court did not render express findings as to each of the section 105(a) factors, such iteration is not required and we may presume that the trial court properly considered all the factors in aggravation and mitigation based on this record.  See *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 16.  The trial court also considered defendant's level of culpability, finding that defendant had the lowest culpability out of the three perpetrators.

Moreover, before the trial court, defendant argued the same mitigating factors he advances on appeal; namely, that the support from his family and community demonstrates he is "very likely to become an upstanding member of the community" upon his release. We will not independently reweigh the factors and substitute our judgment for that of the trial court but will presume that the court considered all relevant mitigating factors prior to sentencing. See *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 95. The sentence imposed by the trial court falls well within the statutory range and is far from disproportionate when compared to the cold-blooded nature of this crime. We therefore conclude that the defendant's cumulative 40-year sentence was not an abuse of discretion.

¶ 45                                    CONCLUSION

¶ 46    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 47    Affirmed.

¶ 48    PRESIDING JUSTICE GORDON, dissenting:

¶ 49    First, I must write separately, because the majority's Rule 23 order does not acknowledge the full impact of the United States Supreme Court's opinion in *Jones v. Mississippi*, 593 U.S. __, 141 S. Ct. 1307 (2021), on issues before us. Second, I dissent, since I would reverse and remand for resentencing for reasons that I explain below.

¶ 50    In the case at bar, defendant received a discretionary 40-year sentence. *Supra* ¶ 12. The *Jones* court found that, under the eighth amendment, "a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth." *Jones*, 593 U.S. at __, 141 S. Ct. at 1321. If that was all the court wrote, then a discretionary sentence such as defendant's sentence would be beyond the reach of an eighth-amendment challenge, such as the one defendant has made.

¶ 51    However, the *Jones* court was careful to carve out exceptions to its blanket statement, finding:  (1) that it did not apply to as-applied claims under the eighth amendment or claims of disproportionality under the eighth amendment; and (2) that it did not preclude states from imposing additional sentencing limits under their own constitutions and statutes.  *Jones*, 593 U.S. at __, 141 S. Ct. at 1322-23.

¶ 52    The latter is particularly important, since this court has repeatedly found that our own state's proportionate penalty clause provides broader protections than the eighth amendment provides.  *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 51 ("the proportionate penalties clause offers a broader path to the same types of relief"); accord *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 40; *People v. Jones*, 2021 IL App (1st) 180996, ¶ 14.  "The purpose of the proportionate penalties clause is to add a limitation beyond those provided by the eighth amendment."  *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35; accord *Glinsey*, 2021 IL App (1st) 191145, ¶ 43; *Jones*, 2021 IL App (1st) 180996, ¶ 15; *Franklin*, 2020 IL App (1st) 171628, ¶ 55.  "Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against oppressive penalties and sentences."  *Minniefield*, 2020 IL App (1st) 170541, ¶ 35; accord *Glinsey*, 2021 IL App (1st) 191145, ¶ 43; *Jones*, 2021 IL App (1st) 180996, ¶ 15.

¶ 53    Although our own proportionate penalties clause is broader, the Illinois Supreme Court decided both *People v. Buffer*, 2019 IL 122327, ¶¶ 13, 25, and *People v. Holman*, 2017 IL 120655, ¶¶ 33, 40, 41, exclusively under the eighth amendment, thereby raising the question of their continued vitality in a post-*Jones* world. In the case at bar, the majority applied both *Buffer* and *Holman* without discussing whether these cases are still good law.

¶ 54    First, in *Holman*, the Illinois Supreme Court found that the United States Supreme

Court's eighth-amendment jurisprudence applied to discretionary sentences. Specifically, our supreme court found that a discretionary life sentence for a juvenile offender "violate[s] the eighth amendment, unless the trial court considers youth and its attendant characteristics." *Holman*, 2017 IL 120655, ¶ 40. The Illinois Supreme Court provided a list of those attendant characteristics and found that a sentencing court must consider this list or some variant of it, in order to satisfy the eighth amendment. *Holman*, 2017 IL 120655, ¶¶ 43-46. By contrast, in *Jones*, the United States Supreme Court found that a discretionary procedure generally provides all the safeguards to which a juvenile is entitled under the eighth amendment. *Jones*, 593 U.S. at __, 141 S. Ct. at 1319. The United States Supreme Court found that, if a sentencing court had the discretion to consider youth, then, by necessity, the sentencing court must have considered it, and no "on-the-record explanation" is required." *Jones*, 593 U.S. at __, 141 S. Ct. at 1319-20.

¶ 55 Even though the Illinois Supreme Court decided *Holman* solely under the eighth amendment, the logic and reasoning by our supreme court in *Holman* also set a floor or minimum for our own proportionate penalties clause. In other words, if our court understood the narrower eighth amendment to guarantee these protections, then our own broader clause must also guarantee them as a minimum or baseline. Since the guarantees of own proportionate penalty clause do not change when the United States Supreme Court's eighth-amendment jurisprudence does, *Holman* is still good law under our own Illinois constitution.

¶ 56 Second, in *Buffer*, the Illinois Supreme Court found that, under the eighth amendment, a life sentence for a juvenile—including a discretionary sentence— was a sentence over 40 years. *Buffer*, 2019 IL 122327, ¶¶ 25, 41. While making this numerical finding exclusively under the eighth amendment, our supreme court determined this number based solely on an examination of our own state's recent legislative enactments. *Buffer*, 2019 IL 122327, ¶¶ 34, 37-40. Our

supreme court explained that "the entity best suited" to chart a numerical course was the Illinois "General Assembly." *Buffer*, 2019 IL 122327, ¶ 34. The 40-year number was determined, not by an examination of federal laws or laws in the various 50 states, but rather "charted" by our own state legislature. *Buffer*, 2019 IL 122327, ¶ 34. While deciding the case under the eighth amendment (*Buffer*, 2019 IL 122327, ¶ 41), our supreme court also found that "[t]his conclusion accords with Illinois law" (*Buffer*, 2019 IL 122327, ¶ 35). Thus, *Buffer*, like *Holman*, continues to apply to discretionary sentences pursuant to our state's proportionate penalties clause.

¶ 57 While the United States Supreme Court's eighth-amendment jurisprudence is in flux,[1] and since *Jones* casts doubt on the continued vitality of *Buffer* and *Holman* under the federal constitution's eighth amendment, the sentencing claims by a juvenile or a young adult in an Illinois court are better evaluated under our own, broader, proportionate penalties clause.

¶ 58 I must respectfully disagree with the majority's statement that "whether *Jones* has an impact on Illinois law need not be addressed in this case." *Supra* ¶ 21. As I previously explained, the governing Illinois precedent, such as *Buffer* and *Holman*, was decided solely under the eighth amendment and, thus, *Jones*' impact on those cases must be considered. The majority writes that *Jones*' impact need not be considered because, in *Jones*, "no issue existed regarding whether or not the eighth amendment applied." *Supra* ¶ 21. The eighth amendment's prohibition against cruel and unusual punishment always *applies*, to every criminal case; the question is whether it was violated. The *Jones* court found no facial violation to the eighth amendment because the sentence before it was discretionary. *Jones*, 593 U.S. at __, 141 S. Ct. at

---

[1] Justice Sotomayor observed that *Jones* represented "an abrupt break from precedent" and that the "Court is fooling no one" when it writes otherwise. *Jones,* 593 U.S. at __, 141 S.Ct. at 1328 (Sotomayor, J., dissenting). Accord *Jones*, 593 U.S. at __, 141 S. Ct. at 1323 (Thomas, J., specially concurring) ("the majority adopts a strained reading" of prior precedent).

1321. Yet, the majority still cites *Holman* for the proposition that: "[o]ur supreme court has read the eighth amendment protections afforded to juvenile sentencing as extending to discretionary life sentences." *Supra* ¶ 18. The majority cites this pre-*Jones* finding in *Holman* about discretionary sentences without pausing to consider whether it is still good law after *Jones*. The majority writes "whether defendant's sentence violated the eighth amendment is *dependent* upon the length of sentence he received." (Emphasis added.) *Supra* ¶ 21. The majority makes this assertion despite the fact that the outcome of the *Jones* case was dependent, not on length, but on whether the sentence before it was discretionary. The majority repeatedly and mechanically cites and applies both *Buffer* and *Holman* without considering *Jones*' impact on them.

¶ 59 As I noted above, since *Jones* casts doubt on the continued vitality of *Buffer* and *Holman* under the federal constitution's eighth amendment, the sentencing claims by a juvenile or a young adult in an Illinois court are better evaluated under our own, broader, proportionate penalties clause.

¶ 60 Applying a proportionate penalties analysis to the facts of this case, I find, first, that defendant's 40-year sentence is not a *de facto* life sentence. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 127. Our supreme court found that "a prison sentence of 40 years or less imposed on a juvenile offender does *not* constitute a *de facto* life sentence." (Emphasis in original.) *Buffer*, 2019 IL 122327, ¶ 41. Pursuant to this finding, a sentence that is exactly 40 years is not a *de facto* life sentence and, thus, the safeguards that apply specifically to *de facto* life juvenile sentences do not apply here.

¶ 61 Defendant's 40-year sentence is only one day short of a sentence that would qualify him for the safeguards noted in *Buffer*. *Buffer*, 2019 IL 122327, ¶¶ 44-47. Our supreme court was very aware of the fact that some juveniles would fall close to the line, but it nonetheless found

that " 'a line must be drawn.' " *Buffer*, 2019 IL 122327, ¶ 29 (quoting *Roper v. Simmons*, 543 U.S. 551, 574 (2005)); *Gunn*, 2020 IL App (1st) 170542, ¶ 133. While I acknowledge the heartache of being one day short, there will always be close cases when lines are drawn and rules are made. *Gunn*, 2020 IL App (1st) 170542, ¶ 133 ("some defendants" will always "fall close to the line").

¶ 62    However, finding that a defendant's sentence is not a *de facto* life sentence does not end our analysis, because defendant has raised an as-applied, as well as a facial, constitutional challenge.  At oral argument, for the purposes of clarifying the issues, this author specifically asked defendant's appellate counsel whether defendant was also raising an as-applied challenge and he confirmed that he was.

¶ 63    Although both facial and as-applied challenges allege a constitutional violation, the two types of challenges are not " 'interchangeable.' " *Holman*, 2017 IL 120655, ¶ 29 (quoting *People v. Thompson*, 2015 IL 118151, ¶ 36).  A facial challenge asserts a violation that is clear on its face, whereas an as-applied challenge is " 'dependent on the particular circumstances and facts of the individual defendant.' " *Holman*, 2017 IL 120655, ¶ 29 (quoting *People v. Thompson*, 2015 IL 118151, ¶ 37).

¶ 64    Even though we reject defendant's facial challenge because his sentence was not *de facto* life, there remains the question of whether his 40-year sentence, as applied to him and the unique facts of his case, shocks the moral sense of the community.

¶ 65    In *Buffer*, our supreme court discussed the type of crimes that would warrant a 40-year sentence for a juvenile offender.  *Buffer*, 2019 IL 122327, ¶¶ 37-39.  The court observed that our General Assembly had recently decided that a sentence of 40 years was *mandatory* for juveniles who committed first-degree murder of certain specified persons, such as police officers and

firefighters engaged in their duties. *Buffer*, 2019 IL 122327, ¶ 39 (discussing 730 ILCS 5/5-4.5-105(c) (West 2018) (setting a 40-year mandatory minimum for these crimes for juveniles), and 730 ILCS 5/5-8-1(a)(1)(c)(iii-vii) (West 2018)) . Thus, the court found that a 40-year sentence "for juvenile offenders who commit egregious crimes" did not run afoul of the constitution. *Buffer*, 2019 IL 122327, ¶ 39.

¶ 66     The facts of *Gunn* presented such an egregious crime. In that case, we found "that a 40-year sentence for a 17-year old who committed a premeditated, gangland-style execution" did not "shock[ ] the moral sense of the community." *Gunn*, 2020 IL App (1st) 170542, ¶ 148.

¶ 67     In *Gunn*, the defendant was the actual shooter. *Gunn*, 2020 IL App (1st) 170542, ¶ 148. The defendant and codefendant both wore dark hoodies on a warm day—a uniform that a bystander "instantly" recognized as meaning that "there was going to be a shooting" and which caused the bystander himself to start running. *Gunn*, 2020 IL App (1st) 170542, ¶¶ 35, 38, 148. The defendant and codefendant strolled down the street, as they approached the victim. *Gunn*, 2020 IL App (1st) 170542, ¶ 34. The minute the victim observed them, he ran, but it was too late. *Gunn*, 2020 IL App (1st) 170542, ¶ 34.  The two men chased the victim into a store, where the victim still tried to evade them, without success.  *Gunn*, 2020 IL App (1st) 170542, ¶¶ 34, 148.  Inside the store, the defendant gunned the victim down and then returned to "calm[ly] and nonchalant[ly]" strolling down the street with the codefendant.  *Gunn*, 2020 IL App (1st) 170542, ¶ 148.  This court found that the defendant did not exhibit "the appearance of a nervous, jumpy juvenile but rather the calm of a cold-blooded killer."  *Gunn*, 2020 IL App (1st) 170542, ¶ 148.  For all these reasons, we found that a 40-year sentence for a "gangland-style execution" by the actual executioner did not shock the moral sense of the community, despite the defendant's 17-year-old age. *Gunn*, 2020 IL App (1st) 170542, ¶ 148.

¶ 68    Applying the factors considered in *Gunn* to this case does not yield the same finding. In the case at bar, defendant was not the actual shooter as was the defendant in *Gunn*. The majority compares the facts of *Gunn* to the facts of this case but, in doing so, omits that key fact that defendant in the instant case was *not* the shooter. *Supra* ¶ 33. In addition, defendant did not commit one of the egregious crimes that the *Buffer* court observed were listed in our state statutes.

¶ 69    In the case at bar, defendant was not armed with a firearm, did not physically harm anyone, had no prior criminal history, and was convicted solely under an accountability theory. The shooter and the other codefendant were both older than defendant, who had completed only his sophomore year of high school. See also *People v. Nooner*, 2021 IL App (1st) 190334-U, ¶¶ 34-45 (Gordon, P.J., specially concurring).

¶ 70    Although this case does not involve a *de facto* life sentence, both the factors considered in *Gunn* and the statements by our supreme court in *Buffer* demonstrate the type of actions by an offender that are needed to justify a 40-year sentence—such as killing a police officer or personally conducting a gangland-style execution. This is simply not it. Although this shooting was terrible, a 40-year sentence for the youngest defendant, who was found guilty on an accountability theory, shocks the moral sense of the community. *Gunn* was never meant to be the start of a slippery slope, but the end of it. The majority's opinion moves the needle a step beyond *Gunn*. Thus, I would reverse defendant's sentence and remand for resentencing in the case at bar.

¶ 71    In the related case of codefendant Essie Nooner, the majority reverses Nooner's sentence and remands for resentencing, citing factors that I discuss above—convicted under an accountability theory, no prior criminal history, etc. *Nooner*, 2021 IL App (1st) 190334-U, ¶¶ 25-26. While the trial court misremembered a fact in codefendant Nooner's case, Nooner was

also a year older than defendant here–and the majority found the facts at sentencing closely balanced. *Nooner*, 2021 IL App (1st) 190334-U, ¶ 26. The remand for resentencing in the Nooner case is an additional reason to remand for resentencing in the case at bar. *Nooner*, 2021 IL App (1st) 190334-U, ¶ 29.

¶ 72    For the foregoing reasons, I must respectfully dissent.